UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DARNISE C.,[1]
                              Plaintiff            DECISION and ORDER

-vs-                                               1:20-CV-01842 CJS

COMMISSIONER OF SOCIAL
SECURITY,
                              Defendant.
_____

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant")

which partially denied the application of Plaintiff for Social Security Disability Insurance

("SSDI") and Supplemental Security Income ("SSI") benefits.   Now before the Court is

Plaintiff's motion (ECF No. 17) for judgment on the pleadings and Defendant's cross-

motion (ECF No. 18) for the same relief.   For the reasons discussed below, Plaintiff's

application is denied, and Defendant's application is granted.

STANDARDS OF LAW

The Commissioner decides applications for SSDI and SSI benefits using a five-

step sequential evaluation:

> A five-step sequential analysis is used to evaluate disability claims. *See* 20
> C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether

---

[1]  The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective
immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in
the United States District Court for the Western District of New York, any non-government party will be
identified and referenced solely by first name and last initial."

1

> the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[2] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.   The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted)

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.  In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).  Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

---

[2] Residual functional capacity or RFC "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999).   However, not every legal error by an administrative law judge ("ALJ") requires reversal.   Rather, an error may be deemed harmless unless it prejudices the plaintiff by negatively affecting the outcome of the ALJ's decision. See*, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).[3]

---

[3] *See also, Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 9 (2d Cir. 2017) ("[W]e agree that any such error was harmless, since Monroe has not identified any prejudice and the record establishes that the error did not affect the ALJ's decision."); *Suttles v. Colvin*, 654 F. App'x 44, 47 (2d Cir. 2016) ("[A]ssuming that the Appeals Council erred, there was nevertheless no reasonable possibility that consideration of Dr. Liotta's report would have altered the ALJ's decision, because the evidence that Dr. Liotta adduced was not materially different from that which was already before the ALJ and the vocational expert when they reached their conclusions."); *but compare, Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015) ("Dr. Wheeler provided the ALJ with an opinion that Greek . . . would likely be absent from work more than four days per month as a result of his impairments or treatment.   . . .   Because a vocational expert in this case testified that Greek could perform no jobs available in large numbers in the national economy if he

If the Commissioner applied the correct legal standards, or if any legal error was harmless, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773. Substantial evidence is defined as "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted).

> The substantial evidence standard is a very deferential standard of review— even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id.*

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

In applying the substantial-evidence standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports

---

had to miss four or more days of work per month, the ALJ's failure to provide adequate reasons for rejecting Dr. Wheeler's opinion was not harmless.").

the decision of the Commissioner.") (citations omitted).

## FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action.   The Court will refer to the record only as necessary for purposes of addressing the particular errors alleged by Plaintiff.

Plaintiff claims to have become disabled on August 26, 2014, due to a wide assortment of physical and mental impairments,[4] with the two most prominent being a pain syndrome, which has been referred to as "fibromyalgia," "generalized body ache,"[5] "chronic pain"[6] and "myofascial pain,"[7]  and a fainting condition which may be attributable to "vasovagal syncope" or Mobitz Type II atrioventricular block.[8]   Plaintiff acknowledges that her doctors have struggled to explain her complaints, and have been somewhat uncertain as to how much of her physical complaints is related to psychological issues.[9] At the same time, Plaintiff has exhibited physical signs consistent with a diagnosis of fibromyalgia.[10]

---

[4] See, Tr. 935 (Plaintiff's attorney's recitation of Plaintiff's alleged disabling conditions at the second administrative hearing).

[5] Tr. 465.

[6] Tr. 765.

[7] Tr. 821.

[8] Tr. 935.

[9] See, e.g., ECF No. 17-1 at p. 6 ("Treatment providers had initially attributed her pain to IBS [(Irritable Bowel Syndrome)], but they were ultimately unable to come to a definitive diagnosis.   Anxiety was thought to be a contributing factor.   . . .   Extensive workups had failed to determine the cause of her symptoms."); id. at p. 7 ("William Koch, MD, opined there was a good chance that some of her symptoms had a basis in psychosomatic function.").

[10] See, e.g., ECF No. 17-1 at p. 8 ("On examination, 12 of the 18 fibromyalgia tender points were positive. Tr. 1467.   Plaintiff also had tenderness at the neck, spine, ribs, pelvis, and upper and lower extremities. Tr. 1467-68.   She had decreased ranges of motion of the spine, ribs, and pelvis. Tr. 1467.").

Plaintiff, who is single and lives with her elementary-school-age daughter, indicates that her conditions are extremely debilitating.   For example, she maintains that she sometimes needs the assistance of others to care for her daughter; that she regularly experiences episodes of syncope or near-syncope, which are more frequent in the Summer, that leave her feeling debilitated for days afterward; that she has migraine headaches several times per week; that she experiences pain throughout her body; that she must regularly rest throughout the day; that she has irritable bowel syndrome ("IBS") and urinary incontinence that interferes with her sleep and requires her to stay near a bathroom; and that she has PTSD and anxiety that limit her ability to socialize with other people.[11]

In connection with her SSDI and SSI claims Plaintiff was examined by a number of treating and consultative doctors and psychologists, several of whom provided statements concerning Plaintiff's work-related functional abilities.   As relevant to this action, for example, treating physician Billy Carstens, D.O. ("Carstens") reported that Plaintiff experienced low back pain, myofascial pain, and fibromyalgia that limited her to sitting, standing and walking for a total of only 2.5 hours in an 8-hour workday, and to lifting only 5 pounds occasionally. Tr. 818.   On the other hand, Plaintiff's primary care physician, Keith Gembusia, D.O. ("Gembusia") indicated that although Plaintiff had IBS and chronic pain, she could sit, stand and walk, each for up to 6 hours in an 8-hour workday, and could constantly lift and carry up to 20 pounds and frequently lift up to 50 pounds. Tr. 760–762. Meanwhile, consultative examiner Gilbert Jenouri, M.D. ("Jenouri"),

---

[11]  ECF No. 17-1 at pp. 2–4.

indicated that Plaintiff had only "minimal to mild restrictions walking, standing, sitting long periods, bending, stair climbing, lifting and carrying,"[12] and consultative examiner Justine Magurno, M.D. ("Magurno") reported:

> There is marked limitation for lifting and carrying.   There is mild to moderate limitation for walking and standing.   There is moderate limitation for bending, pushing and pulling.   She should avoid activities where she or others could be injured if she had a syncopal episode.

Tr. 1525.

Additionally, consultative examiner Amanda Slowik, Psy. D. ("Slowik") indicated that Plaintiff's mental impairments would result in only mild or moderate limitations:

> The claimant's ability to understand, remember or apply simple directions and instructions; use reason and judgment to make work-related decisions; maintain personal hygiene; and be aware of normal hazards is not limited. The claimant's ability to understand, remember, or apply complex directions and instructions is mildly to moderately limited.   The claimant's ability to interact adequately with supervisors, coworkers and the public and regulate emotions is moderately limited.   The claimant's ability to sustain concentration and sustain an ordinary routine is mildly limited.   Difficulties are caused by distractibility, anxiety and low mood.

Tr. 1518.

After the Commissioner denied Plaintiff's claim initially,[13] a hearing was held before an ALJ who, on November 21, 2017, issued a decision finding that Plaintiff was capable of sedentary work and therefore had not been disabled at any time between the alleged disability onset date and the date of the decision. Tr. 26.   Plaintiff appealed, but

---

[12] Tr. 466.

[13] Some of the medical opinions referenced in the preceding paragraph were not rendered until after the ALJ's first decision.

the Appeals Council declined to review the ALJ's decision. Tr. 1.   Plaintiff subsequently commenced an action in this Court pursuant to 42 U.S.C. § 405(g), which culminated in a stipulated order remanding the action to the Commissioner. Tr. 1071 (1:18-CV-0665-FPG, [*Darnise C.*] *v. Commissioner of Social Security*).

In response to this remand, on August 28, 2019, the Appeals Council issued an Order remanding the case to the ALJ, with instructions. Tr. 1074-1078.   The order stated in pertinent part:

> The Appeals Council hereby vacates the final decision of the Commissioner of Social Security and remands this case to an [ALJ] for resolution of the following issue:
>
> The hearing decision does not contain an evaluation of the opinion provided by treating physician Billy Carstens, D.O. (Exhibit 41F).   Dr. Carstens completed a medical source statement in August 2017, noting that the claimant's low back pain, myofascial pain, and fibromyalgia limited the claimant to sitting for 1 hours, standing/walking for less than 15 minutes, and [sic] the claimant would only be able to stand/walk/sit for a total of 2.5 hours. (Id.).   In addition, Dr. Carstens' [sic] opined that the claimant needs to alternate between sitting and standing/walking, needs to elevate her legs, could occasionally lift/carry up to 5 pounds, and could rarely/never stoop. (Id.).   Dr. Carsten's opinion is not consistent with the [ALJ's RFC assessment] and warrants consideration pursuant to 20 CFR 404.1527 and 416.927.
>
> Upon remand the [ALJ] will:
>                             ***
> Give further consideration to the treating, nontreating, and nonexamining source opinions pursuant to the provisions of 20 CFR 404.1527 and 416.927, and explain the weight given to such opinion evidence.

Tr. 1076–1077.

On July 16, 2020, the ALJ held a new hearing, at which Plaintiff, a medical expert ("ME") and a vocational expert ("VE") all testified. Tr. 930–986.   In pertinent part, Plaintiff's attorney asked the VE to consider a hypothetical claimant who, because of inability to regulate her emotions due to mental impairments/emotional problems, would have occasional emotional outbursts at work that would cause disruption of the workplace affecting other employees. Tr. 981–983.   The VE indicated that if a claimant had such an outburst once per week, and persisted in that behavior after being warned, the employee would be terminated. Tr. 983.

On August 17, 2020, the ALJ issued a new decision, granting Plaintiff's claim in part and denying it in part.   The ALJ found that Plaintiff was disabled beginning on January 15, 2019, but not before that date. Tr. 916.[14]  In this action, Plaintiff is challenging that aspect of the decision that found her not disabled prior to January 15, 2019.

In partially denying Plaintiff's claim, the ALJ applied the five-step sequential evaluation and found, in pertinent part, as follows.   At step two, the ALJ found that Plaintiff had severe impairments including fibromyalgia, depression and personality disorder, as well as non-severe impairments including abdominal pain, gastritis, IBS and "bladder issues." Tr. 904.   The ALJ reasoned that Plaintiff's gastrological and urological problems were not severe for the following reason:

> The medical record documents rather few doctor visits for these conditions and shows that medication and/or conservative treatment adequately controls symptoms. (*See*, e.g., 4F and 18F).

---

[14]  The ALJ found that Plaintiff was disabled beginning January 15, 2019, because her mental impairments had worsened.

Tr. 904.   At step three of the sequential evaluation the ALJ found that Plaintiff's impairments did not, either singly or in combination, meet or medically equal the severity of a listed impairment. Tr. 904–905.

Prior to reaching step four, the ALJ found in pertinent part that, prior to January 15, 2019, Plaintiff had the RFC to perform sedentary work, involving "a low stress job defined as simple, routine work with simple workplace decisions and with work not at production rate pace (assembly line pace).   She can tolerate occasional interactions with supervisors, coworkers, and the public and can tolerate minimal changes in workplace processes and settings." Tr. 906.

In making this RFC determination the ALJ discussed Plaintiff's subjective complaints and explained why she did not find them entirely consistent with the evidence. Tr. 907.   In this regard, the ALJ first reviewed Plaintiff's testimony concerning her activities of daily living, which included caring for her 5-year-old daughter. Tr. 907.   Then, particularly regarding the credibility of Plaintiff's complaints about her fibromyalgia symptoms, the ALJ stated:

> The medical evidence regarding the claimant's spinal impairments, fibromyalgia, and pain disorders documents rather mild to moderate clinical abnormalities during this period.   For instance, treatment records from pain management specialist Billy R. Carstens, DO, from an April 18, 2016, examination, revealed the claimant complaining of generalized pain of the neck and back and in all four extremities, in addition to numbness and tingling of the hands, feet, neck and hips.   The claimant also reported having weakness of the hands and legs and of aggravating factors that include increased physical activity and relieving factors that include rest. Physical examination revealed an approximately 30 percent decrease in range of motion of the lumbosacral spine.   However, the claimant showed full range of motion of all four extremities.

She also showed slightly reduced motor strength of 4+/5 for the bilateral upper and lower extremities, but she exhibited intact sensation and normal deep tendon reflexes in the bilateral lower and upper extremities.   The claimant showed a slightly antalgic gait and the ability to squat one-half of the way down and an inability to do heel walking and toe walking.   The claimant also showed tenderness to palpation over several levels of the cervical, thoracic and lumbar spine, in addition to noticeable trigger points and positive straight leg raise test on the left in the seated and supine positions.   Dr. Carstens issued diagnoses that included lumbosacral discogenic radiculopathy, myofascial pain syndrome, mechanical pain disorder, and chronic pain syndrome.

Similar findings were noted during a follow up visit on April 24, 2016.   Dr. Carstens performed osteopathic manipulation treatment to treat the mechanical pain disorder of the cervical, thoracic and lumbosacral regions in the bilateral sacroiliac joints.   The claimant reported an overall improvement in her pain with the treatment and stated that she was very happy with the results.   Dr. Carstens noted essentially the same clinical findings during several subsequent visits for the remainder of 2016 and into 2017.   In addition to administering osteopathic manipulation treatment, he prescribed medications, including ibuprofen and Neurontin.

As recently as June 7, 2017, Dr. Carstens noted ongoing generalized pain of the neck, back and all four extremities, but that the claimant was tolerating her medications.   He further noted that the claimant had unchanged objective physical exam findings from a prior visit in April 2017, which appears to indicate general stability.   Dr. Carstens administered trigger point injections to several areas, including the shoulder area and gluteus maximus.   However, there is no documentation of debilitating pain and no discussion of required neurosurgical consultation.   The record further contains no diagnostic imaging reports of the spine, hips or upper or lower extremities.   More recent treatment notes from 2018 also document no distress or a comfortable appearance despite tenderness and reduced range of motion noted.   Neurological records from 2018 to assess possible MS [multiple sclerosis] also document normal motor tone, 5/5 strength, 2+ reflexes, and the ability to ambulate unassisted despite decreased

sensation, tremor and antalgia.   A consultative examination in 2018[15] also found limitations generally consistent with the ability to perform sedentary work as described above.

Although her spinal and pain related impairments would reasonably cause some functional limitations, the claimant's syncope related symptoms [(i.e., fainting and near-fainting spells)] appear to be her biggest problem.

Tr. 908 (citations to record omitted).

The ALJ further indicated, as part of his RFC discussion, that he found Dr.

Carsten's functional assessment[16] unworthy of much weight, stating:

Little weight is given to the assessment completed by Dr. Carstens.   The assessment indicated that, among other things, the claimant needed breaks, could sit, stand, or walk for 2.5 hours total, could only lift 5 pounds, can balance for 1 hour, and can rarely stoop.   Although this form was completed by a treating physician, the limitations are wholly inconsistent with the claimant's conservative treatment history and ability to perform extensive daily activities as noted above.   The opinion is also inconsistent with the opinions of Dr. Jenouri and Dr. Gembusia.

Tr. 912.

On the other hand, the ALJ indicated that she gave great weight to Dr. Slowik's

consultative psychological opinion, stating: "Great weight is given . . . to the 2018 opinion

of Amanda Slowik, Psy.D., that the claimant has at most, moderate mental limitations.

This opinion is consistent with the claimant's general stability on medication during this

period." Tr. 912.   At the subsequent steps of the sequential evaluation the ALJ found that

Plaintiff could not perform her past relevant work but could perform particular sedentary

---

[15]  The examination was by Justine Magurno, M.D. (Tr. 1521–1525).
[16]  Tr. 816–821.

jobs.

Plaintiff then commenced this action, in which she contends that the Commissioner's decision denying benefits must be reversed for the following reasons: 1) the ALJ erred in citing conservative treatment and the lack of objective findings as proof that Plaintiff's complaints about her fibromyalgia symptoms were not entirely credible, since fibromyalgia is not shown by objective findings and cannot be cured by surgery; 2) the ALJ erred in finding that Plaintiff's gastrointestinal and urological conditions were not severe impairments, and in failing to recognize that IBS may be a symptom of fibromyalgia; 3) the ALJ's erroneous insistence upon objective findings to support Plaintiff's fibromyalgia complaints (was not harmless error since it) caused her to give insufficient weight to the opinion of treating physician Dr. Carstens; and 4) the ALJ failed to adequately explain why she did not incorporate limitations described in the opinion of Dr. Slowik, which she purportedly gave great weight, into the RFC finding, and, in so doing, failed to follow the Appeals Council's remand order.

As discussed further below, Defendant disputes Plaintiff's arguments and maintains that the ALJ's decision is free of reversible legal error and supported by substantial evidence.

The Court has carefully reviewed and considered the parties' submissions.

DISCUSSION

<u>The ALJ's Finding that Plaintiff's Gastrointestinal and</u>
<u>Urological Impairments Were Not Severe</u>

Plaintiff contends that the ALJ erred, at step two of the sequential evaluation, in finding that Plaintiff's "IBS, gastrointestinal and genitourinary symptoms" were not severe impairments, and, later, in failing to include "limitations from gastrointestinal symptoms in the RFC."[17]   In this regard, Plaintiff alleges that the ALJ mistakenly asserted that Plaintiff received only conservative treatment for these ailments, when Plaintiff actually had "multiple invasive diagnostic procedures."[18]

The Court disagrees that the ALJ erred at step two, and alternatively finds that any error in this regard was harmless, since the VE indicated that the extra proposed RFC restrictions concerning these conditions would not preclude a claimant with the RFC found by the ALJ from competitive work.

As mentioned earlier, the ALJ found that Plaintiff's gastrointestinal and urological symptoms were not severe, stating that, "The medical record documents rather few doctor visits for these conditions and shows that medication and/or conservative treatment adequately controls symptoms. (*See, e.g.*, 4F and 18F)." Tr. 904.   However, exhibits 4F and 18F, which the ALJ cited, do not show either that Plaintiff had few doctor's visits for these conditions or that the conditions were well-controlled with medication and conservative treatment.   Moreover, the assertion that Plaintiff had "rather few" doctor

---

[17]  ECF No. 17-1 at p. 39.
[18]  ECF No. 17-1 at p. 39.

visits for her gastrointestinal complaints is contradicted by the record, which shows that she had repeated visits with various doctors, concerning abdominal pain thought to be related to IBS, over a period of years. *See, e.g.*, Tr. 756 (Office note from Dr. Gembusia on May 8, 2017, noting that Plaintiff was continuing to complain of abdominal pain from IBS with constipation, and that Gembusia was making "another referral" to a different gastroenterologist for Plaintiff to be seen as soon as possible); *see also*, Tr. 711 (Office note from Gembusia on March 30, 2017: "She reports she is doing well in general but the continued chronic abdominal pain issue is still present.   She is see[ing] Dr. Edmon[st]on who expressed [that he] expects a diagnosis of Crohn's disease and has ordered a barium enema that will be done tomorrow."); Tr. 715 (Report of James Edmonston, D.O., following colonoscopy with seventeen biopsies to rule out colitis; Edmonston reported normal findings and diagnosed IBS).

Nevertheless, the ALJ's finding that Plaintiff's gastrointestinal and urological symptoms were generally well-controlled with medication, and were not severe, is supported by substantial evidence in the record. For example, when asked generally to rate the effectiveness of the various medications that she was taking, Plaintiff responded that they were "pretty effective." Tr. 1263.   More specifically, Plaintiff indicated that the medication she took for urinary urgency/incontinence, oxybutynin, had "helped a lot," though she still had times when she would "wet herself" if she was not near a bathroom. Tr. 965.   On the other hand, Plaintiff indicated that her IBS was not "under fair control." Tr. 1275.   However, when asked to explain what she meant by that, Plaintiff stated only that when she became "stressed" she could be constipated for several days and need to

take a laxative, and that wearing tight clothing could give her abdominal cramps. Tr. 1275. Accordingly, the ALJ's finding that these conditions would have no more than a minimal effect on Plaintiff's ability to work is supported by substantial evidence.

Moreover, even assuming that the ALJ erred in finding that Plaintiff's gastrointestinal and urological conditions were not severe, the error was harmless.  In that regard, Plaintiff contends that the ALJ should have included limitations related to her gastrointestinal and urological conditions in the RFC finding.  Although, as Defendant points out, Plaintiff does not say what those limitations should have been.  However, only two types of limitation have been proposed:  First, the ALJ asked the VE to consider a hypothetical claimant who would need two brief bathroom breaks at work each day, in addition to her regular breaks and lunch break;[19] and second, Plaintiff's counsel asked the VE to consider a hypothetical claimant who would need "to have a workstation that was close to a restroom." Tr. 977–979.  In both instances, the VE indicated that such requirements would not preclude the claimant from working. *Id.*  Consequently, even assuming that the ALJ had included those additional limitations in the RFC it would not have changed the outcome of the ALJ's decision. The Court therefore finds that any error by the ALJ at step two was harmless.

---

[19]  The ALJ did not expressly discuss Plaintiff's gastrointestinal and urological symptoms at steps three through five of the sequential evaluation.

<u>The ALJ's Treatment of Medical Evidence</u>

<u>Concerning Fibromyalgia</u>

Plaintiff further contends that the ALJ's RFC finding was erroneous due to errors in evaluating Plaintiff's credibility and in weighing the medical opinion evidence.   More specifically, Plaintiff alleges that the ALJ erred in citing conservative treatment and the lack of objective findings as proof that Plaintiff's complaints about her fibromyalgia symptoms were not entirely credible, and in failing to recognize that Plaintiff's IBS symptoms may be a sign of fibromyalgia.

Particularly as to objective evidence, Plaintiff alleges that the ALJ erred "by requiring objective evidence *beyond the clinical findings associated with fibromyalgia under established medical guidelines.*"[20]   Plaintiff indicates, in that regard, that the ALJ mistakenly supposed that fibromyalgia must be "supported by objective clinical findings commonly associated with *musculoskeletal* disorders."[21]

Plaintiff further asserts that these errors were not harmless, since the ALJ's alleged failure to understand the nature of fibromyalgia caused her to give too little weight to the opinion of treating physician Dr. Carstens, whose opinion, if given controlling or great weight, would have resulted in a finding of disability.

---

[20] ECF No. 17-1 at p. 38.
[21] ECF No. 17-1 at p. 38.

Defendant admits that the ALJ discussed conservative treatment and the absence of objective findings when evaluating Plaintiff's fibromyalgia, but maintains that Plaintiff is exaggerating the extent to which the ALJ relied on those factors, while ignoring the other factors that the ALJ cited:

> The ALJ did not rely solely on the absence of objective findings or conservative treatment for Plaintiff's fibromyalgia[.]   To be sure, the ALJ considered those factors, but she also relied upon a multitude of medical opinions, opinions that Plaintiff entirely ignores in the argument section of her brief.

ECF No. 18-1 at p. 8.

Of course, the most significant case in this circuit concerning the evaluation of evidence in fibromyalgia in SSDI and SSI cases is *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) ("*Green-Younger*"), in which the Second Circuit held that it was error for an ALJ to deny a claim based on a lack of objective findings beyond those commonly used to diagnose fibromyalgia:

> Green–Younger exhibited the clinical signs and symptoms to support a fibromyalgia diagnosis under the American College of Rheumatology (ACR) guidelines, including primarily widespread pain in all four quadrants of the body and at least 11 of the 18 specified tender points on the body. *See* SSA Memorandum, Fibromyalgia, Chronic Fatigue Syndrome, and Objective Medical Evidence Requirements for Disability Adjudication, at 5 (May 11, 1998) (explaining that the signs for fibromyalgia, according to the ACR, "are primarily the tender points"); *see also Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir.1996); *Lisa v. Sec. of the Dep't of Health and Human Servs.*, 940 F.2d 40, 43 (2d Cir.1991).
>
> ***
>
> The ALJ [erred when he] effectively required "objective" evidence for a disease that eludes such measurement. As a general matter, "objective"

18

findings are not required in order to find that an applicant is disabled. *See Donato v. Sec. of Dep't of Health and Human Servs*., 721 F.2d 414, 418–19 (2d Cir.1983) ("Subjective pain may serve as the basis for establishing disability, even if ... unaccompanied by positive clinical findings of other 'objective' medical evidence") (emphasis in original) (citation omitted)[.]

Moreover, a growing number of courts, including our own, have recognized that fibromyalgia is a disabling impairment and that there are no objective tests which can conclusively confirm the disease.

*Green-Younger*, 335 F.3d at 107–108 (footnotes, citations and internal quotation marks omitted).   The circuit court indicated that it is error for an ALJ to doubt the credibility of claimant with fibromyalgia based solely on a "relative lack of physical abnormalities" or normal physical exam results. *Id*. at 108–109 ("[W]e have recognized that in stark contrast to the unremitting pain of which fibrositis patients complain, physical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions.   Hence, the absence of swelling joints or other orthopedic and neurologic deficits is [not] indicative that the patient's fibromyalgia is not disabling.") (citations and internal quotation marks omitted).   The *Green-Younger* decision further emphasized that in diagnosing fibromyalgia and evaluating a patient's functional limitations from that illness, a doctor may rely on the claimant's subjective complaints of pain. *Id*. at 107 ("The fact that Dr. Helfand also relied on Green–Younger's subjective complaints hardly undermines his opinion as to her functional limitations, as a patient's report of complaints, or history, is an essential diagnostic tool.") (citation and internal quotation marks omitted).

The Commissioner has also issued a Social Security Ruling specifically addressing the evaluation of fibromyalgia in SSDI and SSI claims. *See*, Soc. Sec. Ruling, Ssr 12-2p; Titles II & Xvi: Evaluation of Fibromyalgia, SSR 12-2P (S.S.A. July 25, 2012).

As with other illnesses, however, there are varying degrees of severity of fibromyalgia, and a "mere diagnosis of fibromyalgia without a finding as to the severity of symptoms and limitations does not mandate a finding of disability." *Rivers v. Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008); *see also, id*. ("Unlike the claimant in *Green–Younger*— whose doctor diagnosed her fibromyalgia as "severe" and the cause of marked limitations in the claimant's activities of daily living, the record in this case contains no such finding. Indeed, Dr. Davis indicated that Rivers should continue her exercise regimen on the NordicTrack and treadmill and consult with a physical therapist to treat her chronic lower back pain and fibromyalgia.") (citation omitted); *Prince v. Astrue*, 514 F. App'x 18, 20 (2d Cir. 2013) ("Drs. Todd D. Daugherty and Edward S. Leib, rheumatologists who first diagnosed Prince with fibromyalgia, noted that Prince's "joints and muscles are essentially healthy" and encouraged her to pursue employment, recreational activity, and exercise.  . . .  Similarly, Dr. David G. Welch observed "relatively little physical pathology ... other than a clear-cut diagnosis of fibromyalgia" and found that Prince had excellent strength, sensation, and range of motion in her core and in all four extremities.") (citations omitted).

Nor is an ALJ required to accept a claimant's statements about the severity and disabling effects of her fibromyalgia where there is conflicting evidence, such as "only

mild or slight symptoms" and activities inconsistent with disabling pain, casting doubt on such statements. *Rivers v. Astrue,* 280 F.App'x at *22-23 ("Nor was the ALJ required to credit Rivers's testimony about the severity of her pain and the functional limitations it caused.   Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings.   Here, the ALJ found that Rivers's testimony was not credible, noting that clinical findings indicate only mild or slight symptoms and Rivers's work activities were not consistent with those of an individual suffering from disabling pain.") (citation and internal quotation marks omitted).

In this case, Plaintiff maintains that the ALJ ran afoul of *Green-Younger* by "discounting" her statements about her subjective pain and symptoms due to the conservative nature of her treatment and lack of objective clinical findings commonly associated with musculoskeletal disorders.   In this regard Plaintiff contends that the ALJ misunderstood the nature of fibromyalgia, by mistakenly supposing that if Plaintiff's fibromyalgia symptoms were as debilitating as she claimed, she would have pursued more extensive treatment, such as surgery, and exhibited more significant objective clinical findings.   On this point, Plaintiff is alluding, in part, to following statements by the ALJ:

> The medical evidence regarding the claimant's spinal impairments, fibromyalgia and pain disorders document rather mild to moderate clinical abnormalities.   …   [T]here is no documentation of debilitating pain and no discussion of the required neurosurgical consultation.   The record further contains no diagnostic imaging reports of the spine, hips or upper or lower extremities.   . . .   [T]he overall evidence of record, such as the claimant's conservative treatment history, generally intact strength and ability to

ambulate unassisted, stable mental conditions, and extent of her daily activities, suggests that the claimant is still capable of performing the range of sedentary work described above.

Tr. 907–911.   The ALJ also referenced, as part of her overall review of the medical evidence, the results of various physical examinations. *See, e.g.*, Tr. 907-908 ("Physical examination revealed an approximately 30 percent decrease in range of motion of the lumbosacral spine.   However, the claimant showed full range of motion of all four extremities.   She also showed slightly reduced motor strength of 4+/5 for the bilateral upper and lower extremities, but she exhibited intact sensation and normal deep tendon reflexes in the bilateral and upper extremities.").

However, the Court does not agree that the ALJ relied on impermissible factors when evaluating Plaintiff's credibility.   The ALJ found that Plaintiff's fibromyalgia was a severe impairment.   However, as noted earlier, the fact that Plaintiff has fibromyalgia does not necessarily make her disabled; rather, the ALJ was required to evaluate the severity of symptoms and limitations.   The statements by the ALJ to which Plaintiff objects were part of a discussion of the evidence spanning approximately five pages. Insofar as the ALJ referenced exam findings and treatments, it was in the context of evaluating the severity of Plaintiff's symptoms.[22]   The Court does not find that the ALJ

---

[22] *See, Clarissa N. v. Comm'r of Soc. Sec.*, No. 1:20-CV-1433 (WBC), 2022 WL 475838, at *6 (W.D.N.Y. Feb. 16, 2022) ("To be sure, as stated by Defendant, even when assessing fibromyalgia, the ALJ may consider objective findings. *See* SSR 12-2p, 2012 WL 3104869, at *2 ("before we find that a person with an MDI [medically determinable impairment] of FM [fibromyalgia] is disabled, we must ensure that there is sufficient objective evidence to support a finding the person's impairment(s) so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activities")."); *see also, Dougherty-Noteboom v. Berryhill*, No. 17-CV-00243-HBS, 2018 WL 3866671, at *7 (W.D.N.Y. Aug. 15, 2018) ("Plaintiff is correct that fibromyalgia frequently presents without objective evidence, and that it would be erroneous to dismiss her subjective complaints purely based on a lack of corroborating objective evidence.   However, even in cases of fibromyalgia, the ALJ must make a credibility assessment

ran afoul of *Green-Younger* or SSR 12-2p in that regard. *See, e.g., Anysha M. v. Commissioner*, 3:19-CV-0271 (CFH), 2020 WL 1955326 at *5-6 (N.D.N.Y. Apr. 23, 2020) ("[T]he ALJ did not rely solely on a lack of objective evidence related to fibromyalgia in finding Plaintiff's allegations of disabling pain were not fully supported by the record.").

Moreover, the ALJ concluded that Plaintiff's fibromyalgia "would reasonably cause some functional limitations," so much so that she limited Plaintiff to less than a full range of sedentary work, which reflects significant impairments.   Notably, in that regard, the ALJ's RFC finding was even more-restrictive than what Plaintiff's primary care physician, Dr. Gembusia, who treated Plaintiff for fibromyalgia, had indicated.

Nor, in that regard, does the Court agree with Plaintiff's contention that the ALJ misstated the evidence concerning the severity of Plaintiff's fibromyalgia symptoms and limitations.[23]   Plaintiff asserts, for example, that the ALJ erroneously stated that Plaintiff was able to drive herself to the disability hearing, when the hearing actually took place by telephone due to Covid-19 restrictions.[24]   However, there were two administrative hearings in this case, and Plaintiff is referring to the second hearing, while the ALJ presumably was referring to the first hearing, to which Plaintiff did, in fact, drive herself.

---

regarding plaintiff's statements about the intensity and persistence of her pain; the ALJ may still consider factors other than objective evidence. In fact, SSR 12-2p, which provides guidance on evaluating fibromyalgia claims, specifically states that the ALJ may consider "the [claimant's] daily activities," as well as "the nature and frequency of the person's attempts to obtain medical treatment for symptoms." SSR 12-2p, 2012 WL 3104869, at *5 (S.S.A. July 25, 2012).") (citations omitted).

[23] ECF No. 17-1 at p. 41 ("The extent to which the ALJ's decision was based on factual errors undermines the extent to which it is supported by substantial evidence.").
[24] ECF No. 17-1 at p. 41.

Plaintiff also implies that the ALJ exaggerated the extent of Plaintiff's work and daily activities support a finding that she was not disabled.[25]  However, the ALJ accurately recounted the evidence in that regard, and Plaintiff has not shown that those activities, which included cooking, cleaning and providing showers for an elderly man over the course of nine months, are inconsistent with the RFC finding, which limited Plaintiff to less than a full range of sedentary work.

Plaintiff also contends that the ALJ erred in failing to consider that her IBS was a sign of fibromyalgia.  However, the Court again disagrees, since Plaintiff has not indicated where any doctor said that her IBS was connected to her fibromyalgia.[26] Consequently, it would have been inappropriate for the ALJ to make that connection herself. *See, Selian v. Astrue*, 708 F.3d 409, 420 (2d Cir. 2013) ("In following the SSA fibromyalgia guidelines that are now 'binding upon SSA's corps of ALJs,' *Vega v. Harris*, 636 F.2d 900, 903 (2d Cir.1981); *see also* 20 C.F.R. § 402.35(b)(1), the ALJ must rely on the medical criteria that the treating physician found to support a diagnosis of fibromyalgia—here, tender points—and may not substitute her own opinion as to the proper diagnostic criteria.").

<u>The ALJ's Evaluation of Dr. Carstens' Opinion</u>

As part of Plaintiff's argument concerning the ALJ's alleged misunderstanding of fibromyalgia, she alleges that such misunderstanding also caused the ALJ to erroneously

---

[25]  ECF No. 17-1 at p. 41.
[26]  The Court is aware that IBS is one possible symptom of fibromyalgia. Soc. Sec. Ruling, Ssr 12-2p; Titles II & Xvi: Evaluation of Fibromyalgia, SSR 12-2P (S.S.A. July 25, 2012).

give less-than-controlling weight to the opinion of Dr. Carstens, a pain management specialist who treated Plaintiff during part of the relevant period and indicated that Plaintiff had drastic limitations from her fibromyalgia.   Plaintiff maintains, in that regard, that "[t]he ALJ's more stringent requirement of objective evidence to support Plaintiff's limitations from fibromyalgia caused her to discount Dr. Carstens' medical source statement, which otherwise would have been deserving of controlling weight under the regulations."[27] Plaintiff alternatively asserts that the ALJ failed to give good reasons for the weight that she assigned to Carstens' opinion.

However, the Court disagrees.   To begin with, for reasons already discussed the Court finds that Plaintiff's argument about the ALJ's alleged misunderstanding of fibromyalgia lacks merit.   That is, the ALJ did not discount Carstens' opinion based on factors that run afoul of *Green-Younger*. *See, e.g., Harrison v. Commissioner*, 18-CV-6715-FPG, 2020 WL 607623 at *3 (W.D.N.Y. Feb. 7, 2020) ("[T]he ALJ properly applied these [fibromyalgia] principles here.   She did not reject Plaintiff's treating physician's opinions based solely on a lack of objective evidence, rather, she found that the opinions were internally inconsistent, unsupported, or contradicted by other evidence.").

Moreover, Carstens' opinion would not have been entitled to controlling weight in any event, since, as the ALJ noted, it was inconsistent with other substantial evidence in the record, including the opinions of Drs. Jenouri and Gembusia. Tr. 912.   Indeed, Carstens' opinion was starkly inconsistent with the opinion of Dr. Gembusia, Plaintiff's

---

[27] ECF No. 17-1 at p. 40.

primary care physician, who, unlike Carstens, treated Plaintiff throughout the entire period at issue in this case. Tr. 760–765, 816–821.

For example, Gembusia stated that Plaintiff could constantly lift and carry up to 20 pounds, and frequently lift up to 50 pounds, while Carstens stated that Plaintiff could only occasionally lift and carry 5 pounds. Tr. 762, 818.   Similarly, Gembusia stated that Plaintiff could sit, stand and/or walk, each for up to six hours in an 8-hour workday, while Carstens indicated that Plaintiff could sit, stand and/or walk each for only one hour in an 8-hour workday. Tr. 760–761, 816–817.   Additionally, Gembusia, who in addition to being familiar with Plaintiff's fibromyalgia symptoms was also aware of her gastrointestinal and urological issues, further indicated that Plaintiff would *not* need additional breaks beyond those usually provided to employees, *i.e.*, a morning break, a lunch break, and an afternoon break, while Carstens indicated that Plaintiff would need additional breaks. Tr. 761, 817.[28]

An ALJ is free to reject the opinion of a treating physician that is inconsistent with other substantial evidence. *See, e.g., Prince v. Astrue*, 514 F. App'x   at *20 ("[B]ecause Dr. Kokernot's [treating] opinion was inconsistent with other substantial evidence in the record, the ALJ committed no error in rejecting his opinion. *See* 20 C.F.R. § 404.1527(c)(2). Four other physicians—Dr. Welch, Dr. Abdul Hameed, Dr. Brett Hartman, and Dr. Aaron Satloff—determined that Prince's mental limitations did not preclude her from performing all work. An ALJ is not required to accept the opinion of a treating

---

[28] And, again, the ALJ's RFC finding is more restrictive than what Gembusia indicated.

physician over other contrary opinions, if the latter are more consistent with the weight of the evidence."). Overall, the ALJ provided good reasons for the weight that she assigned to Carstens' opinion. Consequently, this aspect of Plaintiff's motion is denied.

<u>The ALJ's Treatment of Dr. Slowik's Opinion</u>

Plaintiff further contends that the ALJ failed to adequately explain why she did not incorporate limitations described in the opinion of Dr. Slowik, which she purportedly gave great weight, into the RFC finding, and, in so doing, failed to follow the Appeals Council's remand order. In particular, Plaintiff is referring to the portion of Slowik's opinion indicating that Plaintiff would be "moderately limited" in her ability to interact appropriately with supervisors, co-workers and the public. Significantly, Plaintiff asserts that Slowik's statement on that point means that Plaintiff would regularly have occasional emotional outbursts at work that would cause a disruption of the workplace affecting other employees. Tr. 981–983. Plaintiff further points out that, in response to questioning by Plaintiff's counsel at the hearing, the VE indicated that if a claimant had such an outburst once per week, and persisted in that behavior after being warned, the employee would be terminated. Tr. 983. Plaintiff therefore posits that the ALJ should have included, as part of her RFC determination, that Plaintiff would have occasional disruptive outbursts at work, and that if she had included such a finding, Plaintiff would have necessarily been found disabled.

Defendant disagrees and asserts that "[t]he fallacy in Plaintiff's argument is that the ALJ was not required to find, based on Dr. Slowik's opinion of at-most-moderate

limitations, that Plaintiff would experience episodes of crying that would disrupt her coworkers and her supervisor."[29]   Defendant further maintains that mild-to-moderate mental limitations are consistent with the RFC for unskilled work, and that the ALJ did, in fact, incorporate Slowik's opinion into the RFC finding by limiting Plaintiff to simple, routine, low-stress work involving only occasional interaction with people.

The Court agrees with Defendant and finds that Plaintiff's argument on this point lacks merit.   For instance, the Court agrees that Plaintiff's contention does not follow from Slowik's report, since Slowik never indicated that Plaintiff would have occasional emotional outbursts at work that would disrupt the working environment.   Rather, Slowik indicated that Plaintiff had "adequate" social skills, and that any problems with Plaintiff's ability to interact with others was due to "distractibility, anxiety and a low mood," not an inability to regulate emotions.[30]   Consequently, Plaintiff's counsel's hypothetical question to the VE on this point was not supported by Slowik's report, contrary to what Plaintiff now argues.   Moreover, the ALJ accounted for this moderate limitation by restricting Plaintiff to simple, low-stress work involving only occasional interactions with people.   This aspect of Plaintiff's motion is also denied.

## CONCLUSION

For the reasons discussed above, Plaintiff's motion for judgment on the pleadings (ECF No. 17) is denied and Defendant's cross-motion for the same relief (ECF No. 18) is

---

[29] ECF No. 18-1 at p. 21.
[30] Tr. 1516, 1518; *see also*, Tr. 981–982 (Attorney asked VE to consider a claimant with "an occasional inability to regulate emotions.").

granted.   The Clerk of the Court is directed to enter judgment for Defendant and close

this action.

So Ordered.

Dated: Rochester, New York
       March 28, 2022

ENTER:

CHARLES J. SIRAGUSA
United States District Judge